USCA1 Opinion

 

 August 26, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1034 UNIVERSITY OF RHODE ISLAND, Plaintiff, Appellant, v. A. W. CHESTERTON COMPANY, Defendant, Appellee. ____________________ ERRATA SHEET ERRATA SHEET The opinion of this Court issued on August 16, 1993, is amended as follows: Page 8, line 5, should read: as the nominal plaintiff . . . UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1034 UNIVERSITY OF RHODE ISLAND, Plaintiff, Appellant, v. A. W. CHESTERTON COMPANY, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ ____________________ Before Cyr and Boudin, Circuit Judges, ______________ and Hornby,* District Judge. ______________ ____________________ Louis J. Saccoccio with whom Merlyn P. O'Keefe and Packer & ____________________ ___________________ ________ O'Keefe were on brief for appellant. _______ Steven E. Snow with whom Partridge, Snow & Hahn was on brief for ______________ ______________________ appellee. ____________________ August 16, 1993 ____________________ __________________ *Of the District of Maine, sitting by designation CYR, Circuit Judge. The University of Rhode Island CYR, Circuit Judge. _____________ ("URI") appeals a judgment disallowing its breach of warranty claims against A.W. Chesterton Company ("Chesterton"), contending that the district court lacked subject matter jurisdiction, and challenging various rulings at trial. Finding no error, we affirm. I I BACKGROUND BACKGROUND __________ We recite only those record facts essential to an understanding of the issues raised on appeal, drawing all reason- able inferences in favor of plaintiff-appellant URI. Richmond ________ Steel, Inc. v. Puerto Rican American Ins. Co., 954 F.2d 19, 20 ____________ _______________________________ (1st Cir. 1992). The R/V Endeavor is a vessel chartered by the National Science Foundation to URI's Graduate School of Oceanog- raphy (GSO) for research purposes. In the summer of 1985, John Metz, the GSO's port engineer, discovered serious rust corrosion on the inside of the Endeavor's steel ballast tanks, which are submerged in salt water during normal operation of the vessel. Responding to a Chesterton advertisement, Metz received test samples of "Rust Transformer," a Chesterton product which pur- portedly converts surface corrosion into a rust-inhibitor, which in turn serves as a base for further coats of paint. Satisfied with the test-sample results, Metz invited Chesterton sales representatives aboard the Endeavor. After inspecting the 2 Endeavor's ballast tank corrosion, Chesterton's representatives recommended that Metz use Chesterton's 1-2-3 System (using Rust Transformer, a primer, and a final enamel coat) to rehabilitate the tanks. Metz ordered the 1-2-3 System on September 11, 1985.1 Six months after URI completed the 1-2-3 System applica- tion, the new coating on the ballast tanks began to loosen and flake off. URI allegedly expended $100,000 to correct the problem. URI brought suit against Chesterton in Rhode Island state court on May 4, 1989, alleging negligence, strict liability, and breaches of an express warranty and implied warranties of merchantability and fitness for a particular purpose. Chesterton promptly removed the action to federal district court. URI moved for remand on the ground that URI, as an "alter ego, arm, or agent" of the State of Rhode Island, is not a "citizen" of Rhode Island for diversity purposes. The district court denied URI's remand motion without an evidentiary hearing, relying on an earlier district court decision, see ___ Vanlaarhoven v. Newman, 564 F. Supp. 145 (D.R.I. 1983) (Selya, ____________ ______ J.), which determined that URI was not an "arm" of the State for sovereign immunity purposes. ____________________ 1The original URI complaint alleged that Metz was reassured by Chesterton that the 1-2-3 System would work on Endeavor's ballast tanks. On the other hand, the product's written instruc- tions advised that the system was not recommended for surfaces regularly immersed in sea water. In an amended complaint, URI alleged that Chesterton representatives observed the URI crew applying the 1-2-3 System to the ballast tanks, but said nothing to URI representatives about the unsuitability of the system or its improper application. 3 This court declined to entertain URI's interlocutory appeal from the jurisdictional ruling but noted disagreement among the circuits as to the proper criteria for determining the citizenship of state universities for diversity purposes. We recommended that the district court conduct "limited factfinding" on remand relating to several factors pertinent to URI's citizen- ship, including (1) "the degree of URI's dependence on and functional integration with the state treasury," (2) "the per- centage of URI's annual budget that derives from state appropria- tions," and (3) "whether the legislature bases levels of such appropriations in part on the amount of nonappropriated funds available to URI."2 On remand, the district court denied URI's motion for a pretrial evidentiary hearing relating to these jurisdictional matters. The jury trial began on December 3, 1991. After the district court excluded the testimony of URI's only expert witness on the issue of contract damages, URI abrupt- ly rested its case. Judgment was entered for Chesterton on all counts, as a matter of law, pursuant to Fed. R. Civ. P. 50(a), and URI appealed. II II DISCUSSION DISCUSSION __________ ____________________ 2As an alternate and independent reason for declining to entertain the interlocutory appeal, this court noted that the litigation was unlikely to be so protracted as to warrant appel- late interruption, given the nature and scope of URI's contract claims. 4 A. Subject Matter Jurisdiction A. Subject Matter Jurisdiction ___________________________ URI urges us to set aside the judgment and remand the case to state court on the ground that Chesterton, a Massachu- setts corporation, has not established diversity. URI contends that it is not a Rhode Island "citizen," but a mere "arm" or "alter ego" of the State. See Gibbs v. Buck, 307 U.S. 66, 69 ___ _____ ____ (1939) (holding that party invoking diversity jurisdiction must establish sufficient facts to warrant its exercise); Bank One, _________ Texas, N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992) (same); ___________ ______ see also Shamrock Oil Corp. & Gas Co. v. Sheets, 313 U.S. 100, ___ ____ _____________________________ ______ 108-09 (1941) (removal statute should be strictly construed against removal); McNutt v. General Motors Acceptance Corp., 298 ______ _______________________________ U.S. 178, 187 (1936); Wilson v. Republic Iron & Steel Co., 257 ______ __________________________ U.S. 92, 97 (1921). We begin with first principles. A State cannot be a "citizen" of itself for purposes of diversity jurisdiction.3 Moor v. County of Alameda, 411 U.S. 693, 717 (1973); Postal Tel. ____ _________________ ___________ Cable Co. v. Alabama, 155 U.S. 482, 487 (1894). On the other _________ _______ hand, a political subdivision possessing the formal status of a "body politic and corporate," such as a county or municipality, is presumed a "citizen" for diversity purposes "unless it is simply 'the arm or alter ego of the State.'" Moor, 411 U.S. at _________ ____ 717, 721 (finding that Alameda County had a "sufficiently inde- ____________________ 3Section 1332(a) provides that "[t]he district courts shall have original jurisdiction of all civil actions . . . [involving over $50,000] . . . between . . . citizens of different States . . . ." 28 U.S.C. 1332(a)(1). 5 pendent corporate character" to be a "citizen" of California for diversity purposes) (citation omitted) (emphasis in original); Illinois v. City of Milwaukee, 406 U.S. 91, 97 (1972); Cowles v. ________ _________________ ______ Mercer County, 74 U.S. (7 Wall.) 118, 121-22 (1869).4 Thus, in _____________ ____________________ 4A political subdivision's "detachment" from the State generally will deprive it of the right to partake of the State's sovereign immunity under the Eleventh Amendment. See U.S. Const. ___ amend. XI ("The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state . . . ."). Although we have noted the essential similarity between the immunity and diversity tests, see George ___ ______ R. Whitten, Jr. Inc. v. State Univ. Constr. Fund, 493 F.2d 177, ____________________ ________________________ 179 n.2 (1st Cir. 1974) (tests "closely allied and yet not identical"); cf. Krieger v. Trane Co., 765 F. Supp. 756, 758 (D. ___ _______ _________ D.C. 1991) (rejecting any distinction between the two tests), we have not had occasion to identify the precise nature of any differences. In this case, however, we address, and reject, two proposed distinctions. First, Eleventh Amendment analysis normally would focus primary attention on any financial drain on _____ the State treasury caused by a judgment adverse to URI, see Quern ___ _____ v. Jordan, 440 U.S. 332, 337 (1979); Edelman v. Jordan, 415 U.S. ______ _______ ______ 651, 663 (1974), a concern which obviously does not arise in a diversity case where the State-related plaintiff seeks to recover _______ a monetary judgment. Significantly, however, courts have not accepted the notion that sovereign immunity exists only if the ____ State treasury is threatened. See Cory v. White, 457 U.S. 85, ___ ____ _____ 90-91 (1982); Kroll v. Board of Trustees of Univ. of Illinois, _____ ________________________________________ 934 F.2d 904, 908 (7th Cir.), cert. denied, 112 S. Ct. 377 _____ ______ (1991); Harden v. Adams, 760 F.2d 1158, 1163 (11th Cir.) (Troy ______ _____ State University), cert. denied, 474 U.S. 1007 (1985). Whether _____ ______ in the diversity or the immunity context, the analysis must center on the State-related party's enduring legal identity as a juridical entity separate from the State. The second possible distinction we must consider is that, unlike sovereign immunity, nondiversity cannot be waived by the State. See State Highway Comm'n of Wyoming v. Utah Constr. Co., ___ ________________________________ ________________ 278 U.S. 194, 199 (1929); George R. Whitten, Jr., Inc., 493 F.2d _____________________________ at 179. Generally, however, the "waiver of immunity" inquiry would follow the initial determination that the State-related ______ entity was not sufficiently autonomous to escape characterization as an "alter ego" of the State. For example, in Vanlaarhoven, ____________ the court based its holding on the alternate ground that, even if URI were merely an "alter ego" of the State, the State had expressly waived URI's immunity under state law by granting it the authority to "sue or be sued" in its own name. Vanlaarhoven, __________ ____________ 564 F. Supp. at 149; see also infra note 7. While such a bypass ___ ____ _____ 6 principle at least, public and private corporations are accorded similar treatment as "citizens" for diversity purposes. See 28 ___ U.S.C. 1332(c)(1) ("For purposes of this section . . . a corporation shall be deemed to be a citizen of any State by which it has been incorporated . . . ."); see also Media Duplication ___ ____ _________________ Servs., Ltd. v. HDG Software, Inc., 928 F.2d 1228, 1236 (1st Cir. ____________ __________________ 1991). The Rhode Island Board of Higher Education ("Board") is nominally constituted by the State of Rhode Island as the legal entity which acts in behalf of URI and other public postsecondary educational institutions in Rhode Island.5 The Board has been constituted a "public corporation," R.I. Gen. Laws 16-59-1,6 see infra note 10, just as the County of Alameda is a "body ___ _____ ____________________ argument is impermissible where the sole issue is URI's citizen- ship for diversity purposes, sovereign immunity case law, and its identification of the relevant attributes of autonomy, is no less probative in diversity cases; hence, we cite to these cases as apposite. 5The complaint mistakenly designates URI as the plaintiff. Since URI is not a distinct legal entity under Rhode Island law, we treat the Board as the real party in interest, as did the district court. 6Section 16-59-1(a) provides, in pertinent part: "There is hereby created a board of governors for higher education, some- times hereinafter referred to as the 'board' or the 'board of governors,' which shall be and hereby is constituted a public corporation, empowered to sue and be sued in its own name, to have a corporate seal, and to exercise all the powers, in addi- tion to those hereinafter specifically enumerated, usually appertaining to public corporations entrusted with control of postsecondary educational institutions and functions." R.I. Gen. Laws 16-59-1(a) (1992). In all significant respects, this section, enacted in 1988, merely extended the extant powers possessed by the Board's immediate predecessor, the entity involved in Vanlaarhoven. ____________ 7 corporate and politic" under California law. Moor, 411 U.S. at ____ 719 (citing Cal. Gov't Code 23003). Several ancillary principles derive from Moor. The ____ criteria are substantially similar for evaluating whether an entity is a citizen of the State for diversity purposes, or a State for Eleventh Amendment sovereign immunity purposes, see ___ Northeast Fed. Credit Union v. Neves, 837 F.2d 531, 534 (1st Cir. ___________________________ _____ 1988) (tests "pretty much the same"); see supra note 4, and ___ _____ present the same ultimate question for decision: whether the State of Rhode Island remains the real party in interest, not- ____ _____ __ ________ withstanding URI's designation as the nominal plaintiff. See id. ___ ___ at 533 ("For the purpose of diversity jurisdiction, the determi- native factor is whether the state is the real party in inter- est.") (quoting Krisel v. Duran, 386 F.2d 179, 181 (2d Cir.), ______ _____ cert. denied, 390 U.S. 1042 (1967)); see also Kovats v. Rutgers, _____ ______ ___ ____ ______ _______ 822 F.2d 1303, 1307 (3d Cir. 1987) (immunity), cert. denied, 489 _____ ______ U.S. 1014 (1987); Ronwin v. Shapiro, 657 F.2d 1071, 1073 (9th ______ _______ Cir. 1981) (Board of Regents of Arizona) (immunity and diversi- ty); Jagnandan v. Giles, 538 F.2d 1166, 1173 (5th Cir. 1976) _________ _____ (Mississippi State University) (immunity), cert. denied, 432 U.S. _____ ______ 910 (1977); Krieger v. Trane Co., 765 F. Supp. 756, 757-58 _______ _________ (D.D.C. 1991) (diversity). Thus, most unincorporated state agencies and departments are readily recognizable as mere "arms" or "alter egos" of the State. On the other hand, though the State's formal incorpora- tion of a State-related entity is not necessarily dispositive on 8 the issue of its autonomy, either for immunity or diversity purposes, see, e.g., Jagnandan, 538 F.2d at 1174, 1176; Krieger, ___ ____ _________ _______ 765 F. Supp. at 760, 762, the legislative act of incorporation should prompt a thorough examination into the precise nature of the entity established under state law. See Moor, 411 U.S. at ___ ____ 719 (undertaking "a detailed examination of the relevant provi- sions of California law" in order to rule out Alameda County's "mere agency"); id. at 721 n.54 (generally repudiating resort to ___ "conclusory" determinations as to entity's legal character); see ___ also Lake Country Estates, Inc. v. Tahoe Regional Planning ____ _____________________________ _________________________ Agency, 440 U.S. 391, 401 (1979); Mt. Healthy City Sch. Dist. Bd. ______ _______________________________ of Educ. v. Doyle, 429 U.S. 274, 280 (1977); Kovats, 822 F.2d at ________ _____ ______ 1307; Goss v. San Jacinto Junior College, 588 F.2d 96, 98 (5th ____ ___________________________ Cir. 1979). Accordingly, comparing the incorporated public entity to the polar extremes (the State on the one hand, and political subdivisions on the other), we must determine whether the nominal public corporation possesses "a sufficiently indepen- dent corporate character to dictate that it be treated as a citizen of [the State of incorporation]." Moor, 411 U.S. at 721. ____ See Mt. Healthy, 429 U.S. at 280 (finding city board "more like a ___ ___________ ____ ____ county or city than it is like an arm of the State") (emphasis added); see also Kashani v. Purdue Univ., 813 F.2d 843, 845 (7th ___ ____ _______ ____________ Cir. 1987), cert. denied, 484 U.S. 846 (1988); Goss, 588 F.2d at _____ ______ ____ 98. Often these comparative appraisals unavoidably lead to imprecise distinctions in degree, rarely amenable to ready 9 resolution. Cf. Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & ___ ____________________ ______________________ Sewer Auth., ___ F.2d ___, ___ (1st Cir. 1993) [No. 91-1602, 1993 ___________ U.S. App. LEXIS 10064, at 10 (1st Cir. May 3, 1993)] (noting that agency's entitlement to immunity "poses an essentially functional __________ inquiry, not easily amenable to bright-line answers or mechanical solutions") (emphasis added). Like their private counterparts, public corporations are hardly monolithic, having been vested with whatever powers, rights, and privileges state legislatures may bestow to suit the public purpose for which the particular corporation was commissioned. Although the vast majority of state universities, incorporated and unincorporated alike, have been found to be "arms" of the State for immunity and diversity purposes, each state university must be evaluated in light of its unique characteristics. See Kovats, 822 F.2d at 1303; Kashani, ___ ______ _______ 813 F.2d at 845; Hall v. Medical College of Ohio, 742 F.2d 299, ____ ________________________ 302 (6th Cir. 1984), cert. denied, 469 U.S. 1113 (1985); United _____ ______ ______ Carolina Bank v. Board of Regents, 665 F.2d 553, 557 (5th Cir. _____________ _________________ 1982) (Austin State University); Soni v. Board of Trustees of ____ _____________________ Univ. of Tennessee, 513 F.2d 347, 352 (6th Cir. 1975), cert. ___________________ _____ denied, 426 U.S. 919 (1976); University Sys. of New Hampshire v. ______ ________________________________ United States Gypsum, 756 F. Supp. 640, 645 (D.N.H. 1991).7 ____________________ ____________________ 7Even if it were presumed that the immunity and diversity standards converge, see supra note 4, Vanlaarhoven was not ___ _____ ____________ conclusive as to URI's citizenship for diversity purposes. Chesterton argues that URI is barred, by Vanlaarhoven and col- ____________ lateral estoppel, from litigating the diversity jurisdiction issue. We do not agree. Chesterton did not raise the estoppel issue in the district court, nor did the court invoke collateral estoppel by way of reference to Vanlaarhoven. Thus, Chesterton ____________ waived the issue. McCoy v. Massachusetts Inst. of Technology, _____ __________________________________ 10 We have propounded an illustrative list of criteria by no means exhaustive often germane to the Eleventh Amendment "arm" or "alter ego" determination, including whether the entity (1) performs an "essential" or "traditional" governmental func- tion, as opposed to a nonessential or merely proprietary one; (2) exercises substantial autonomy over its internal operations; (3) ____________________ 950 F.2d 13, 22 (1st Cir. 1991), cert. denied, 112 S. Ct. 1939 _____ ______ (1992) (issues not "squarely" raised before trial court cannot be raised on appeal). Moreover, the "alter ego" determination in Vanlaarhoven was not "essential" to the judgment, in at least two ____________ respects. See Restatement (Second) of Judgments 27 ("When an ___ __________________________________ issue of fact or law is actually litigated by a valid and final judgment, and the determination is essential to the judgment, the ___ ___ _____________ __ _________ __ ___ ________ determination is conclusive . . . .") (emphasis added). First, the Vanlaarhoven court, as an alternate holding, assumed arguendo ____________ ________ that URI might be an "alter ego" of the State, but went on to hold that Rhode Island law had recognized similar grants of the power to sue and be sued as express waivers by the State of an alter ego's sovereign immunity from unconsented suit. Vanlaar- ________ hoven, 564 F. Supp. at 149; see supra note 4. Second, URI, the _____ ___ _____ defendant in Vanlaarhoven, prevailed on the merits. Except in ____________ limited circumstances not present here, the party that prevails on the merits is not obligated to appeal from an adverse ruling __ ___ _________ __ on a collateral issue. Cf. Deposit Guar. Nat'l Bank v. Roper, ___ _________________________ _____ 445 U.S. 326, 334-35 (1980) (noting that adverse ruling presum- ably would have no effect in later litigation). Although not binding, Vanlaarhoven nonetheless remains ____________ persuasive precedent in its own right. See Metcalf & Eddy, ___ ___ ______________ F.2d at ___ [No. 91-1602, 1993 U.S. App. LEXIS 10064, at 13 n.4 (1st Cir. May 3, 1993)] (noting that immunity of agency need not always be considered de novo; "[w]here the agency's activity and __ ____ its relation to the state remain essentially the same, prior ___________ ___ ____ circuit precedent will be controlling") (emphasis added); see ___ also infra note 16. URI argues that much of Vanlaarhoven's ____ _____ ____________ precedential weight was eroded by the later repeal of R.I. Gen. Laws 16-31-1 to 15 in 1988, and its replacement with the new statutory scheme. See R.I. Gen. Laws 16-59-1. We agree with ___ the district court that the legislative modifications in 1988 were largely inconsequential, see infra Section II.A.2.a., and ___ _____ that Vanlaarhoven's "lengthy description of the fiscal relation- ____________ ship between the University and the State of Rhode Island is as accurate today as when it was written in 1983 . . . ." Universi- _________ ty of Rhode Island v. A.W. Chesterton Co., 721 F. Supp. 400, 402 ___________________ ___________________ (D.R.I. 1989). 11 enjoys meaningful access to, and control over, funds not appro- priated from the State treasury; (4) possesses the status of a separate "public corporation"; (5) may sue and be sued in its own name; (6) can enter into contracts in its own name; (7) has been granted a state tax exemption on its property; or (8) has been expressly debarred from incurring debts in the State's name or behalf. See Metcalf & Eddy, ___ F.2d at ___ [No. 91-1602, 1993 ___ _______________ U.S. App. LEXIS 10064, at 11-12 (1st Cir. May 3, 1993)]; In re _____ San Juan DuPont Plaza Hotel Fire Litigation, 888 F.2d 940, 942 _____________________________________________ (1st Cir. 1989); Ainsworth Aristocrat Int'l Pty, Ltd. v. Tourism ____________________________________ _______ Co. of Puerto Rico, 818 F.2d 1034, 1038 (1st Cir. 1987). These __________________ diverse considerations are designed to disclose the extent to which state law endows the incorporated State-related entity with the operational authority, discretion, and proprietary resources with which to function independently of the State. See George R. _____________ ___ _________ Whitten, Jr., Inc. v. State Univ. Constr. Fund, 493 F.2d 177, 180 __________________ ________________________ (1st Cir. 1974); cf. Metcalf & Eddy, ___ F.2d at ___ [No. 91- ___ _______________ 1602, 1993 U.S. App. LEXIS 10064, at 12 (1st Cir. May 3, 1993)] ("[T]he more tightly the agency and the state are entangled, the more probable it becomes that the agency shares the state's Eleventh Amendment immunity.").8 ____________________ 8URI argues that Rhode Island case law provides a definitive statement on the functional interdependence of the Board and the State. See, e.g., State of Maryland Cent. Collection Unit v. ___ ____ __________________________________________ Board of Regents, 529 A.2d 144, 145 (R.I. 1987); Opinion to the _________________ ______________ Governor, 181 A.2d 618 (R.I. 1962). State court decisions are ________ entitled to great deference in our diversity and sovereign immunity determination. See Ainsworth, 818 F.2d at 1037; see ___ _________ ___ also Harden, 760 F.2d at 1163; Jackson v. Hayakawa, 682 F.2d ____ ______ _______ ________ 1344, 1350 (9th Cir. 1982) (California State University); Jag- ____ 12 1. The Board's Operational Autonomy 1. The Board's Operational Autonomy ________________________________ After reviewing many decisions relating to public postsecondary educational institutions, we are impressed, as was the district court in this case and in Vanlaarhoven, by the ____________ extraordinary measure of autonomy enjoyed by the Rhode Island Board of Higher Education. As with most "state" universities, the Board is charged with an essential and traditional governmen- ____________________ nandan, 538 F.2d at 1175-76; Brennan v. University of Kansas, 451 ______ _______ ____________________ F.2d 1287, 1290 (10th Cir. 1971). But see Kovats, 822 F.2d at ___ ___ ______ 1310 (state case law treating entity as "arm" does not undermine autonomy for diversity purposes). Nevertheless, the "real party in interest" analysis is ultimately a matter of federal law. See _______ ___ Moor, 411 U.S. at 720 (looking to California state court deci- ____ sions merely to confirm Court's independent diversity determina- _______ tion, based on California statutes); Hughes-Bechtol, Inc. v. West ____________________ ____ Va. Bd. of Regents, 737 F.2d 540, 543 (6th Cir.) (diversity), ___________________ cert. denied, 469 U.S. 1018 (1984); Long v. Richardson, 525 F.2d _____ ______ ____ __________ 74, 79 (6th Cir. 1975) (Memphis State University); cf. Jacin- ___ ______ toport Corp. v. Greater Baton Rouge Port Comm'n, 762 F.2d 435, _____________ ________________________________ 439 (5th Cir. 1985). In the instant case, we find the State of Maryland and its __________________ predecessor decisions inconclusive. First, State of Maryland __________________ involved the distinct question of the United States Supreme Court's original jurisdiction, not the issue of diversity juris- diction. State of Maryland, 529 A.2d at 147. Second, the court's _________________ finding that URI and the State were the same "party" is dictum, the State of Maryland having conceded the point. Id. Finally, ___ although State of Maryland cites to prior state case law, see __________________ ___ Opinion to the Governor, 181 A.2d 618, 621 (R.I. 1962), neither _______________________ case engages in an extended analysis of the Board's corporate powers or characteristics. See Moor, 411 U.S. at 721 n.54 ___ ____ (expressing disfavor for "conclusory" determinations of entity's legal character); Jacintoport Corp., 762 F.2d at 438 (refusing to _________________ follow state case law on immunity question where cited cases "did not deal with the precise question before us, nor was their inquiry based on even analogous jurisprudential concerns"). Thus, unlike the situation in Moor, where the Court was able to find ____ "the clearest indication possible from California's Supreme Court ________ __________ ________ of the status of California's counties," Moor, 411 U.S. at 720 ____ (emphasis added), neither the focus nor the nature of the analy- sis in State of Maryland enables us to derive a clear indication _________________ as to the Rhode Island Supreme Court's views on the critical factors controlling the "real party in interest" determination in the context of federal diversity jurisdiction. 13 tal function namely, the provision of postsecondary education- al facilities to the citizens of Rhode Island. See R.I. Const. ___ art. XII, 1; Chang v. University of Rhode Island, 375 A.2d 925, _____ __________________________ 933-34 (R.I. 1977); see also Kovats, 822 F.2d at 1310 (providing ___ ____ ______ educational facilities is an essential or traditional governmen- tal function, not a proprietary one); Hall, 742 F.2d at 305 ____ (same); Rutledge v. Arizona Bd. of Regents, 660 F.2d 1345, 1349 ________ _______________________ (9th Cir. 1981) (same); cf. also Kashani, 813 F.2d at 847-48 (if ___ ____ _______ entity serves entire state, instead of one region, more likely an "arm" of State). As a general rule, therefore, it may well be that an entity established to conduct a core governmental func- tion is less likely to be vested with meaningful freedom from governance by the State's elected officials. Nevertheless, this isolated factor is seldom dispositive.9 An exception must lie ____________________ 9For example, in Moor the county's responsibility for many ____ traditional and essential governmental functions, including the provision of water services, flood control, rubbish disposal, and harbor and airport facilities, appears to have been accepted by the Court as affirmative evidence of citizenship. See Moor, 411 ___ ____ U.S. at 720. These governmental responsibilities were noted by the Court in acknowledging the county's power to levy taxes to finance its functions. Similarly, URI is empowered to fix and collect tuitions and fees and enjoys plenary control over these nonappropriated funds, as well as its educational functions. Cf. ___ University of Tennessee v. United States Fidelity & Guar., Co., _______________________ ____________________________________ 670 F. Supp. 1379, 1384 (E.D. Tenn. 1987) (legislature's control of tuition rates suggests "arm"). We discern from Moor a general ____ rule of thumb: the State's delegation of essential governmental functions, together with the power to generate and control the nonappropriated revenues with which to perform those governmental functions, normally will be viewed as supporting, rather than undermining, the entity's independent status for citizenship purposes. Cf. Metcalf & Eddy, ___ F.2d at ___ [No. 91-1602, 1993 ___ _______________ U.S. App. LEXIS 10064, at 17, 17 n.6 (1st Cir. May 3, 1993)] (noting that, if all traditional government functions triggered immunity protection, local school boards would have been deemed "arms" of state, and that agencies which derive revenue through 14 where the statutory scheme, as a whole, confutes any legislative __ _ _____ intent to establish the entity as a mere "arm" of the State. See ___ Kovats, 822 F.2d at 1312 (performance of governmental, nonpropri- ______ etary function not necessarily indicative of lack of autonomy). Accordingly, we must examine the particular powers with which the Board is endowed under its statute of "incorporation." From an operational standpoint, the Board is denominat- ed a "public corporation," Moor, 411 U.S. at 719 (county's ____ corporate status and powers "most notabl[e]" attributes of citizenship); cf. Hall, 742 F.2d at 305 (noting that school's ___ ____ lack of separate corporate status suggests mere agency),10 which may "sue and be sued in its own name." R.I. Gen. Laws 16- 59-1(a).11 The Rhode Island statutes elsewhere define the term ____________________ "user fees" for performance of "governmental" functions are unlikely to be characterized as "arms" merely by virtue of the traditional nature of their mission) (citing Royal Caribbean ________________ Corp. v. Puerto Rico Ports Auth., 973 F.2d 8 (1st Cir. 1992)). _____ _______________________ 10Some courts have held that corporate status ought not be regarded as probative unless the legislature expresses its intent to confer perpetual corporate status upon the entity. See, e.g., _________ ___ ____ Hall, 742 F.2d at 299. The rationale of these cases appears to ____ be that the legislature reserves the right to revoke all delegat- ed powers to such a nonperpetual entity, at any time. Id. See ____________ ___ ___ also Kashani, 813 F.2d at 847; Jackson, 682 F.2d at 1350; Bren- ____ _______ _______ _____ nan, 451 F.2d at 1290. As we are unable to accept the premise ___ that legislative enactments can be immunized from amendment by succeeding legislatures, let alone be perpetuated, we respectful- ly decline to follow these decisions. We note also that these decisions conflict with Moor, insofar as they suggest that most ____ political subdivisions cannot be "citizens" because succeeding legislatures retain the power to alter or rescind prior delega- tions of the State's police power. 11It is not always clear in the Eleventh Amendment context whether the court has already determined that the entity is an "arm" of the State, and is referring to this provision (power to sue and be sued) only as evidence of an explicit waiver of the 15 "public corporation" as "a corporate entity which is considered a governmental agency but which has a distinct legal existence from ___ _____ ___ _ ________ _____ _________ ____ the state or any municipality, [and] does not constitute a ___ _____ __ ___ ____________ department of state or municipal government . . . ." Id. 16- ___ 62-4 (emphasis added). See Harden v. Adams, 760 F.2d 1158, 1163 ___ ______ _____ (11th Cir. 1985) (Troy State University) (holding that statutory definitions of "state" and "political subdivision" may be rele- vant factors); compare Kovats, 822 F.2d at 1310 (evidence that _______ ______ entity is "instrumentality," but otherwise excluded from some statutory definitions of "state," is probative of citizenship) with United Carolina Bank, 665 F.2d at 557 (noting that entity ____ ____________________ falls clearly within statutory definition of "state"). But cf. ___ ___ ____________________ dependent entity's sovereign immunity. See, e.g., Rozek v. ____ ____ _____ Topolnicki, 865 F.2d 1154, 1158 (10th Cir. 1989); Long, 525 F.2d __________ ____ at 77; Soni, 513 F.2d at 352; see also supra notes 4 & 7 (discus- ____ ___ ____ _____ sing Vanlaarhoven's alternative "waiver" holding). The bare ____________ power to sue is unlikely to hold complete sway in the threshold "alter ego" determination either in diversity or immunity cases. See Kashani, 813 F.2d at 847 (power to sue and be sued not ___ _______ conclusive of autonomy); Jagnandan, 538 F.2d at 1174, 1176; _________ Krieger, 765 F. Supp. at 760, 762; cf. Hall, 742 F.2d at 305 _______ ___ ____ (deliberate withholding of power to sue highly probative of lack of autonomy). But the power to sue in the entity's own name, when coupled with other powers of self-determination typically held by distinct juridical entities (power to contract, power to buy, hold, and sell property), undeniably affords the entity some additional independence from the State, since the entity need not seek the State's consent to bring, defend, or settle a lawsuit. In this case, we note in particular that (1) URI brought suit exclusively in its own name, and (2) its counsel of record is not a legal officer of the State of Rhode Island. See Jacintoport ___ ___________ Corp., 762 F.2d at 442 (noting commission's right to "employ _____ private attorneys to represent it" as evidence that it has separate legal identity from State); Tradigrain, Inc. v. Missis- ________________ _______ sippi State Port Auth., 701 F.2d 1131, 1136 (5th Cir. 1983) ________________________ (Thornberry, J., dissenting) (noting as evidence of citizenship that Authority "employs its own counsel, and is not represented by the State of Mississippi in this action"); cf. Hall, 742 F.2d ___ ____ at 305 (university's counsel is state attorney general). 16 Lewis v. Midwestern State Univ., 837 F.2d 197, 198 (5th Cir.), _____ ______________________ cert. denied, 488 U.S. 849 (1988) (mere statutory definition as _____ ______ "agency" suggests "alter ego"); Kashani, 813 F.2d at 847 (holding _______ that entity's designation as "separate" from State for some purposes is inconclusive of autonomy); Krieger, 765 F. Supp. at _______ 759(findingterm"independent agency"inconclusiveevidenceofautonomy). Ten of the thirteen Board members are appointed by the Governor,12 with the advice and consent of the senate, see R.I. ___ Gen. Laws 16-59-2(a), a legislative design most courts routine- ly view as evidence of an entity's lack of independence from State control. See, e.g., Lewis, 837 F.2d at 198; Kashani, 813 ___ ____ _____ _______ F.2d at 847 (7 of 10 members appointed); Harden, 760 F.2d at ______ 1163; Hall, 742 F.2d at 306; Gay Students Servs. v. Texas A & M ____ ___________________ ___________ Univ., 737 F.2d 1317, 1333 n.28 (5th Cir. 1984), cert. denied, _____ _____ ______ 471 U.S. 1001 (1985); United Carolina Bank, 665 F.2d at 558; _____________________ Rutledge, 660 F.2d at 1347 (all 8 appointed); Prebble v. Brod- ________ _______ _____ rick, 535 F.2d 605, 610 (10th Cir. 1976) (University of Wyoming). ____ But see Kovats, 822 F.2d at 1311 (concluding that, even if ___ ___ ______ majority is appointed by governor, that fact is not conclusive of "alter ego" status). The power of appointment (and reappoint- ment) is significant, and may entail risks of subtle or indirect manipulation of the entity's decisionmaking processes by elected officials. ____________________ 12The Governor appoints the chairperson as well, and two ex __ officio positions on the Board are occupied by members of the _______ legislative branch. Cf. Harden, 760 F.2d at 1163 (noting the fact __ ______ that executive branch officials serve as ex officio members of __ _______ Board as evidence of "alter ego" status). 17 On the other hand, the Rhode Island statutory scheme is somewhat unusual in the respect that it attempts to protect the Board from "partisan or personal" pressures. R.I. Gen. Laws 16-59-3 ("removal solely for partisan or personal reasons unre- lated to capacity or fitness for the office shall be unlawful"). Although individual Board members might be vulnerable to pres- sure, the Board as a whole is insulated to some degree from sudden "reversal[s] of policy" by fixed (three-year) and stag- _____ gered terms. Id. 16-59-1. Cf. Jacintoport Corp. v. Greater ___ ___ __________________ _______ Baton Rouge Port Comm'n, 762 F.2d 435, 442 (5th Cir. 1985) _________________________ (focusing on autonomy of Commission as an entity, not only on __ __ ______ independence of the individual commissioners). Board members receive minimal compensation ($50 per day of actual service, not to exceed $3000 annually). Since it is highly unlikely that members would depend on their Board compensation as a primary source of income, the economic coercion attending the threat of removal would be minimal. R.I. Gen. Laws 16-59-1(e). Aside from the power of appointment, the governor has no direct voice in Board decisionmaking. Cf., e.g., Fitchik v. New Jersey ___ ____ _______ ___________ Transit Rail Operations, Inc., 873 F.2d 655, 663 (3d Cir.) _______________________________ (finding entity not "alter ego," despite gubernatorial veto power), cert. denied, 493 U.S. 850 (1989). Finally, and most _____ ______ significantly, individual Board members are provided with signi- ficant insulation from partisan or personal pressure, in that no Board member may be removed except for cause, after a full ___ _____ hearing and appellate review. R.I. Gen. Laws 16-59-2, 3. 18 As a corporate entity, the Board's supervisory powers are pervasive. It unilaterally appoints, and may dismiss at its pleasure, the commissioner of higher education and the presidents of the individual educational institutions it oversees, see id. ___ ___ 16-59-4(5), (6). It possesses plenary power over the post- secondary school organizational structure, accounting procedures, the creation and abolition of all postsecondary school depart- ments and programs of study, as well as their affirmative action hiring practices. Id. 16-59-4(10), (11). See Kovats, 822 F.2d ___ ___ ______ at 1311-12 (finding that minimal state supervision over entity's operations suggests autonomy); cf. Hall, 742 F.2d at 306 (noting ___ ____ that state control through mandated programs of study suggests lack of independence); University of Tennessee v. United States _______________________ _____________ Fidelity & Guar, Co., 670 F. Supp. 1379, 1384 (E.D. Tenn. 1987) ____________________ (observing that entity must comply with controller's regulations, and legislature controls physical plant operations). But see ___ ___ Kashani, 813 F.2d at 847 (finding entity's power to prescribe _______ curricula not probative of its autonomy). The Board is expressly exempted from compliance with the Rhode Island Administrative Procedures Act, R.I. Gen. Laws 16-59-12, see Kovats, 822 F.2d ___ ______ at 1312 (APA exemption suggests autonomy); cf. Fitchik, 873 F.2d ___ _______ at 663 (APA applicability suggests "arm"); Jackson v. Hayakawa, _______ ________ 682 F.2d 1344, 1350 (9th Cir. 1982) (California State University) (same); Krieger, 765 F. Supp. at 760 (same), as well as from _______ certain personnel employment and equipment requisition regula- tions, R.I. Gen. Laws 16-59-21 (providing Board with exemption 19 from R.I. Gen. Laws 35-3-1(5), (6) in "the interest of educa- tional efficiency"). See Kovats, 822 F.2d at 1313 (exemption ___ ______ from civil service rules suggests autonomy); cf. United Carolina ___ _______________ Bank, 665 F.2d at 558 (applicability of employment regulations ____ suggests dependence); Krieger, 765 F. Supp. at 759-60 (lack of _______ exemption from general budget controls and procurement rules suggests "arm"); University of Tennessee, 670 F. Supp. at 1384 ________________________ (legislature's control of employee compensation suggests "arm"). The Board holds full legal title to all URI real and personal property, with the attendant power to acquire, hold, and dispose of URI property and "other like property as deemed necessary for the execution of its corporate purposes." R.I. Gen. Laws 16-59-1. See Moor, 411 U.S. at 719 (noting that ___ ____ county may "sell, hold, or otherwise deal in property"); see also ___ ____ Fitchik, 873 F.2d at 663 (power to purchase property suggests _______ citizenship); cf. Hall, 742 F.2d at 306 (unlike community college ___ ____ which holds title to property, no independence where educational entity may sell property only with State's approval); University __________ of Tennessee, 670 F. Supp. at 1384 (legislature's control over ____________ all physical plants and leases indicates lack of indepen- dence).13 Although URI's real and personal property is exempt ____________________ 13Since the Board's legal title to URI property is held "in trust" for the State, R.I. Gen. Laws 16-59-1(a), URI argues that the Board's fiduciary duty to the State, the equitable owner of the property, inhibits its discretion to administer the property as record owner. The language of the statute neverthe- less suggests that the Board's business decisions to purchase, administer, and dispose of URI property are largely unrestricted, and absent misfeasance would be impervious to challenge by the State. See Kovats, 822 F.2d at 1309 (legal title to property, ___ ______ 20 from taxation, see R.I. Gen. Laws 44-3-3(1); Powers v. Harvey, ___ ______ ______ 103 A.2d 551, 552 (R.I. 1954), in many cases this factor is considered minimally probative. Often, tax policy is used by States to encourage certain types of activity even though the target entities are otherwise entirely independent of state government. Rhode Island is no exception in this respect. See, ___ e.g., R.I. Gen. Laws 44-3-3(11) (cemeteries), (12) (incor- ____ porated or free libraries), (13) (veterans' organizations), (15) (volunteer fire departments), (21) (water treatment facilities). Moreover, nonpublic educational institutions in Rhode Island _________ partake of a similar tax exemption, albeit narrower than that of the Board. R.I. Gen. Laws 44-3-3(8) (private school property is tax exempt to the extent it is used "exclusively for educa- tional purposes"). Arguably, of course, tax exemption may be attributable to the State's equitable title to the URI property. _________ We think it at least as plausible, however, that the general assembly exempts Board property from taxation as a means of fostering performance of the Board's corporate functions. See ___ Kovats, 822 F.2d at 1311 (autonomy not fatally undermined by tax ______ exemption); Kashani, 813 F.2d at 846 (less probative where State _______ grants tax exemption to political subdivisions); Hall, 742 F.2d ____ at 307 (tax exemption relevant only if it is not accorded other entities which are not "alter egos"). But see University of ___ ___ _____________ ____________________ though held in trust, coupled with discretionary power to dis- pose, and to control both proceeds and income therefrom, suggests independence); cf. Hall, 742 F.2d at 306 (entity is "arm" if ___ ____ property held in State's name). 21 Tennessee, 670 F. Supp. at 1384 (university is an "arm" because _________ it is fully tax exempt, while private schools enjoy a partial exemption only). As a natural corollary to its power to control URI property, the Board possesses,14 and freely exercises, its corporate power to enter into contracts in its own name. See ___ State of Maryland Cent. Collection Unit v. Board of Regents, 529 ________________________________________ ________________ A.2d 144, 145 (R.I. 1987); cf. Hughes-Bechtol, 737 F.2d at 544 ___ ______________ (lack of power to contract without invoking State as named party indicates entity is "arm"); Tradigrain, Inc. v. Mississippi State ________________ _________________ Port Auth., 701 F.2d 1131, 1133 (5th Cir. 1983) (noting that ___________ authority's power to enter into contract was limited; any con- tract in excess of $2500 must be advertised and awarded to lowest bidder); University of Tennessee, 670 F. Supp. at 1384 (entity is _______________________ "arm" where legislature exerts control over its personal services contracts). But cf. Kashani, 813 F.2d at 847 (power to enter into ___ ___ _______ contracts not conclusive of independent status); Hall, 742 F.2d __________ ____ ____________________ 14The Board's power to contract is not specifically enumerated in the statute, but is implicit in the grant of "all the [other] powers . . . usually pertaining to public corpora- tions . . . ." R.I. Gen. Laws 16-59-1. Contrary to URI's contention, we see no reason to infer that this general grant of corporate power is contradicted by other statutory provisions which specifically authorize the Board to guarantee particular loans in the state's name, see, e.g., R.I. Gen. Laws 16-32-11 ___ ____ (Board empowered to guarantee student loans), 16-32-12, 14 (Board empowered to guarantee, "in the name of the state," loans to "societies of students" up to a total of $1.2 million; at de- fault, loans "shall become state obligations in like manner as any state bond"); Jacintoport Corp., 762 F.2d at 439, 441 (State- _________________ 's mere guarantee of agency's bonds is too "ancillary" an effect to subvert agency's independence from State); see also infra note ___ ____ _____ 17. 22 at 305 (same); Krieger, 765 F. Supp. at 760, 762 (same). The _______ Board's capacity to contract for the maintenance and repair of a federally funded GSO research vessel likewise suggests opera- tional autonomy. See Moor, 411 U.S. at 719 (county "may contract ___ ____ for the construction and repairs of structures") (emphasis _______________________ added); cf. State Highway Comm'n of Wyoming v. Utah Constr. Co., ___ _______________________________ ________________ 278 U.S. 194, 199 (1929) (finding that entity is "arm" where "contract for the construction of the work was between the [defendant] and the State"). Thus, the Board's operational autonomy, approximating that of the political subdivision in Moor, sets it apart from ____ most entities with similar educational missions and tips the balance in favor of the district court's finding that the Board is a "citizen" of Rhode Island for diversity purposes. 2. The Board's Fiscal Autonomy15 2. The Board's Fiscal Autonomy15 ___________________________ a. Statutory Scheme a. Statutory Scheme ________________ Like most other public universities, URI's operations are financed in part by State appropriations, approved annually by the general assembly ("appropriated" funds), R.I. Gen. Laws 16-59-9 (such appropriations as the general assembly "deems necessary"), and in part by non-State sources, such as tuition ____________________ 15Although the multi-factor test is nonweighted, courts generally agree on the primacy of the financial autonomy factor in the overall balance. See Ainsworth, 818 F.2d at 1038 (finan- ___ _________ cial accountability who pays or gets paid is the most ____ important factor in test); see also Fitchik, 873 F.2d at 664; ___ ____ _______ Kashani, 813 F.2d at 846 (same); Hall, 742 F.2d at 304; Rutledge, _______ ____ ________ 660 F.2d at 1349. 23 charges, fees, and donations ("nonappropriated" funds). As with all state universities, the legislature has the final say as to the size of the annual appropriation. The Board, on the other hand, prepares the five-year funding plan and budget for submis- sion to the general assembly, and the Board alone "determines priorities of expenditures." Id. 16-59-4(4). Cf. United ___ ___ ______ Carolina Bank, 665 F.2d at 558 (legislature's "comprehensive" ______________ control of appropriated funds suggests entity's financial depen- dence); Prebble, 535 F.2d at 610 ("No expenditure may be made in _______ excess of an appropriation and no money appropriated may be used for any purpose other than for which it is appropriated."). Furthermore, the Board has plenary authority to reallocate appropriated funds among its various programs, facilities, and agencies. R.I. Gen. Laws 16-59-9(c). Cf. Krieger, 765 F. Supp. ___ _______ at 760 (lack of power to reallocate appropriated funds suggests entity is "arm"). And, as noted, the Board has substantial income from sources other than State appropriations, see Kroll, ___ _____ 934 F.2d at 908 n.3 (availability of substantial revenue from other sources may be very relevant to autonomy inquiry), includ- ing tuition charges, housing, dining and administrative fees, donations, bequests and devises, the income and proceeds from URI property, and federal grants. URI's tuition and fees are set by the Board. URI's housing, dining, and auxiliary facilities are totally self- supporting, with no State appropriations slated for these purpos- es after 1987. R.I. Gen. Laws 16-59-9(d). Thus, much of its 24 nonappropriated funding is roughly analogous to revenues raised by means of a political subdivision's power to impose taxes upon its constituents to defray the costs of the public services it provides, a power delegated by the State to enable the political subdivision to finance its "corporate" public service mission. See Moor, 411 U.S. at 719-20 (county "authorized to levy taxes" ___ ____ and to "issue general obligation bonds payable from county taxes"); Metcalf & Eddy, ___ F.2d at ___ [No. 91-1602, 1993 U.S. _______________ App. LEXIS 10064, at 19 (1st Cir. May 3, 1993)] (in immunity context, "[t]he power and opportunity to generate a revenue stream [through user fees] and thereby finance an agency's operations is an important attribute of the agency's separate identity"); Fitchik, 873 F.2d at 663 (power to set and collect _______ fares and fees tilts balance toward autonomy); see also supra ___ ____ _____ note 9; cf. Kashani, 813 F.2d at 846 (lack of power to impose ___ _______ taxes is equivalent to ultimate financial dependence on the State); Hall, 742 F.2d at 304 (same); United Carolina Bank, 665 ____ _____________________ F.2d at 558 (same); University of Tennessee, 670 F. Supp. at 1384 _______________________ (legislature's control of tuition fees suggests "arm"). There is no provision in Rhode Island law permitting State intervention in URI's income stream from inception to expenditure. The Board's nonappropriated funds are neither "covered into," nor merged with, the general fund, but are kept in segregated accounts pending discretionary disbursement by the Board "without the necessity of appropriation or reappropriation by the general assembly." R.I. Gen. Laws 16-59-18. Compare _______ 25 Kovats, 822 F.2d at 1308-09 (financial accounts not "within" ______ control of State treasury indicate autonomy), with Lewis, 837 ____ _____ F.2d at 197 (finding evidence of lack of autonomy in the fact that funds must go back into State treasury, their expenditure extremely restricted); Hall, 742 F.2d at 304 (entity is an "arm" ____ of the State if it has power to issue bonds, but disbursements of bond proceeds are restricted, and if State merely "permits" formal segregation as matter of convenience); United Carolina ________________ Bank, 665 F.2d at 558 (nonappropriated funds deposited into State ____ treasury, then reappropriated for disbursement); Jagnandan, 538 _________ F.2d at 1176 (nonappropriated funds go directly into commingled treasury account); Krieger, 765 F. Supp. at 760 (where entity _______ does not "control" expenditure of funds, segregation not proba- tive of autonomy); University of Tennessee, 670 F. Supp. at 1383- _______________________ 84 (all university funds commingled in one account, subject to state comptroller's regulations and "regular" audits). Unexpend- ed balances in the Board's segregated nonappropriated funds account are carried forward from year to year, awaiting discre- tionary disbursement by the Board for "nonrecurring" items, a practice which effectively allows the Board to exceed its annual appropriation and its annual budget if necessary. R.I. Gen. Laws 16-59-9(b). Cf. Jagnandan, 538 F.2d at 1175 (lack of authority ___ _________ to "exceed" budgeted expenditures, even from nonappropriated funds, without approval of executive or legislature, indicates dependency); Prebble, 535 F.2d at 610 (same). _______ 26 Finally, the State of Rhode Island engages in but limited monitoring of Board revenues and expenditures, see ___ Harden, 760 F.2d at 1163-64 (the more financial oversight, the ______ more likely the university's debts are state's debts), though a few statutory provisions serve to keep the State generally apprised of the Board's financial decisions, enabling the type of ____ financial monitoring usually considered indicative of a lack of meaningful fiscal autonomy. See, e.g., Lewis, 837 F.2d at 199 ___ ____ _____ (regular auditing of both appropriated and nonappropriated funds suggests "arm"); Kashani, 813 F.2d at 845-46 (entity is "arm" as _______ it submits budget, and "Indiana examines [its] finances care- fully"); Harden, 760 F.2d at 1163 (submission of annual financial ______ reports suggests "arm"); United Carolina Bank, 665 F.2d at 558 ____________________ ("extensive" reporting requirements suggest lack of autonomy); Rutledge, 660 F.2d at 1349-50 ("detailed" report to governor); ________ Krieger, 765 F. Supp. at 756 (annual report to "general public" _______ suggests "alter ego"); University of Tennessee, 670 F. Supp. at _______________________ 1379 (submission of annual report to governor or legislature, with "detailed statement" of receipts and expenditures, indicates "arm"). On the other hand, the level of State fiscal monitoring _____ of the Board is comparatively unintrusive. For example, though URI's treasurer must submit financial reports to the state controller for "preaudit," the purely "ministerial" audit moni- tors Board expenditures only for possible illegality and avail- ability of funds, not with a view to the prudence of the Board's financial decisions. R.I. Gen. Laws 16-59-20. See Kovats, 822 ___ ______ 27 F.2d at 1311 (mere "reporting" of spending decisions not indica- tive of lack of autonomy). URI makes a rather wan attempt to undermine Vanlaarhoven by citing a subsequently enacted "limita- ____________ tion" on the Board's purchasing power. See R.I. Gen. Laws 37- ___ 2-1 and 37-2-7(11) (Board's purchases can be made only through State Purchasing agent's office). As the district court found, however, nothing in this statutory requirement portends quality review or rejection of purchase orders by the purchasing agent. R.I. Gen. Laws 16-59-20 ("controller [shall not] interpose his or her judgment"). See supra note 7. Far from a meaningful ___ _____ limitation on the Board's power to disburse its funds, this measure appears to have been designed solely to enable the Board to avail itself of the financial savings associated with pooled purchasing power. With Moor as our benchmark, therefore, we conclude that ____ the Rhode Island statutory scheme demonstrates that the Board, unlike more "typical" state educational entities, possesses the essential attributes of operational and financial autonomy needed to qualify as a Rhode Island "citizen" for diversity purposes. b. "Functional Integration" b. "Functional Integration" ______________________ In a resourceful effort to avoid Vanlaarhoven, URI ____________ urges its "functional integration" theory, whose genesis appar- ently lay in our earlier "recommendation" to the district court following dismissal of URI's interlocutory appeal. See supra p. ___ _____ 4. URI argues, for example, that the Board's ostensible indepen- dence in financial matters would prove illusory if, in fact, (1) 28 the Board's annual budget were funded by State-appropriated monies to such an extent that its nonappropriated revenues were rendered functionally insignificant, or (2) the Rhode Island general assembly were to employ its statutory pre-audit proce- dures to attune the Board's annual State appropriation so as to force the Board to expend its anticipated and accumulated nonap- propriated revenues in lieu of a more ample annual State appro- priation. See, e.g., Krieger, 765 F. Supp. at 761 (evidence of ___ ____ _______ actual control by State would trump evidence of formal autonomy). We emphasize that URI does not assert the existence of ___ _________ budgetary data which would demonstrate that the Board enjoys less financial autonomy than the enabling statute indicates. More- over, notwithstanding its efforts to persuade the district court to conduct a separate evidentiary hearing on diversity jurisdic- tion, URI has taken no initiative to substantiate its "functional integration" theory, either by way of an evidentiary proffer below, or even by way of the barest allusion to supportive data in its brief or oral argument before this court. Instead, URI insists that Chesterton, as the party requesting removal, see ___ supra Section II.A, was required to bear the entire burden of _____ ______ proof and production on every conceivable fact even including "negative" facts which might prove relevant to the Board's _____ _____ citizenship status. Thus, even after trial on the merits, URI speculates that there may be evidence which would preclude a reliable determination as to federal diversity jurisdiction. For the reasons hereinafter explained, we think URI inadvisably 29 banked on a cramped view of the proper allocation of the burdens of proof and production relating to the jurisdictional issue, misapprehended the proper role of "functional integration" data, and exaggerated the import of our earlier "recommendation" to the district court for further factfinding on remand. For some reason, our earlier invitation to engage in additional factfinding on remand went unheeded. URI intimates that it did all it could by requesting a separate evidentiary ________ hearing, and that the district court simply discounted our recommendation as to the possible relevance of "functional integration" evidence. In our view, however, URI mischarac- terizes the remand order. While we suggested the desirability of supplementary factfinding, the precise factfinding procedure to ___________ _________ be employed always rests within the sound discretion of the trial court. See Foman v. Davis, 371 U.S. 178, 182 (1962); O'Toole v. ___ _____ _____ _______ Arlington Trust Co., 681 F.2d 94, 98 (1st Cir. 1982) (finding no ___________________ abuse of discretion, as "the court was under no obligation to require an evidentiary hearing . . . [but] has the right to determine the procedures it will employ to decide a jurisdiction- al issue") (citation omitted). At no time did we require a separate evidentiary hearing on the jurisdictional issue. ________ Indeed, given our alternative ground for dismissing URI's inter- locutory appeal namely, that it appeared unlikely that a trial on the merits would be prolonged the district court's decision to defer its jurisdictional determination until trial was entire- ly consistent with the remand order. 30 Nor did the district court prevent URI from introducing _______ any such statistical evidence at trial. Following an unrecorded pretrial conference with counsel, the district court did deny URI's motion for a separate evidentiary hearing. In that connec- tion, URI has provided no indication of the legal contentions advanced by either party at the pretrial conference, nor of the grounds for the district court's decision to bypass a pretrial evidentiary hearing. Chesterton, on the other hand, asserts that the conference involved an extended discussion about the appro- priateness of a separate pretrial hearing, but that the court opted to permit the presentation of evidence on the jurisdiction- al issue at trial. __ _____ Viewed in proper procedural context, therefore, the present claim hinges entirely on URI's unremitting allocation of the burdens of persuasion and production to Chesterton, and not on any lack of opportunity to raise or substantiate its "func- tional integration" claim. Significantly, our remand order took no position as to which party would be obliged to come forward _____ with evidence of functional integration, nor did it suggest that proof of lack of functional integration was required in every case. Of course, Chesterton, the party invoking diversity jurisdiction, bears the ultimate burden of proving diversity of ________ citizenship. See Topp v. Compair, Inc., 814 F.2d 830, 839 (1st ___ ____ _____________ Cir. 1987). Nevertheless, there is more to be said concerning the burden of production: 31 [T]he party who invoked diversity juris- diction has the burden of proving all facts upon which jurisdiction could be sustained. If [the invoking party] does construct a prima facie showing of diversity, [the chal- lenging party] must overcome or rebut this showing in order to dismiss the [removal petition]. Support for [the challenger's] position may be derived from affidavits, depositions, and sworn statements filed by the parties from which the Court can examine and evaluate all relevant factors and sur- rounding circumstances but the exact method of determining the jurisdictional issue lies within the sound discretion of the district court. United States Fidelity & Guar. Co. v. Di Massa, 561 F. Supp. 348, __________________________________ ________ 350 (E.D. Pa. 1983) (citation omitted). Although neither Chesterton nor URI submitted affidavits, depositions, or sworn statements, the district court properly conducted inquiry into the controlling jurisdictional facts, pursuant to Moor, by ____ examining the Rhode Island enabling statute. Under Moor, such an ____ inquiry is designed primarily to provide the court with a compe- tent basis for determining the legal framework within which the relationship between a State and a State-created entity are required to function. In the present case, the Rhode Island enabling statute constituted a sufficient proffer on the issue of the Board's financial autonomy. See, e.g., Tradigrain, 701 F.2d ___ ____ __________ at 1132 ("the state's constitutional, statutory, and decisional law" comprise source material for the court's citizenship analy- sis); see also Indiana Port Comm'n v. Bethlehem Steel Corp., 702 ___ ____ ___________________ _____________________ F.2d 107, 109 (7th Cir. 1983); cf. supra note 8. ___ _____ As noted, see supra Section II.A.2.a, the enabling ___ _____ statute's broad grant of control to the Board over non- 32 appropriated revenues weighs heavily in Chesterton's favor and satisfied its prima facie burden on the issue of financial autonomy. Furthermore, financial autonomy is but one component of the fact-intensive citizenship inquiry mandated by Moor, and ____ Chesterton prevailed on most other relevant jurisdictional facts as well. See supra Section II.A.1. It was incumbent on URI, ___ _____ therefore, to mount an effective challenge to the prima facie showing of financial autonomy. See Ohio Nat'l. Life Ins. Co. v. ___ _________________________ United States, 922 F.2d 320, 327 n.7 (6th Cir. 1990) ("That the _____________ burden of proof is always on the [party asserting jurisdiction] does not mean that a [challenger], without any proof on his part, can put the [party asserting jurisdiction] to proof by affidavit of jurisdictional facts sufficiently alleged in the complaint. The [challenger] must at least submit some proof that the juris- ____ _____ dictional facts so alleged do not exist.") (citation omitted) (emphasis added). Absent evidence or a compelling argument that the fiscal autonomy permitted the Board under Rhode Island law, as determined by the district court, does not actually obtain, URI failed to overcome Chesterton's prima facie showing.16 ____________________ 16Moreover, in view of the presumptive deference due Vanlaarhoven in the present context, see supra note 7, URI's ____________ ___ _____ "functional integration" theory was not being written on a blank slate. See, e.g., Rollins v. Board of Governors for Higher ___ ____ _______ _______________________________ Educ., 761 F. Supp. 930, 931 (D.R.I. 1990) (citing Vanlaarhoven _____ ____________ as precedent); cf. Cowan v. University of Louisville Sch. of ___ _____ __________________________________ Medicine, 900 F.2d 936, 940 (6th Cir. 1990) (proper to rely on ________ federal court precedent finding school not autonomous); Dube v. ____ State Univ. of New York, 900 F.2d 587, 594 (2d Cir. 1990) (SUNY) ________________________ (same), cert. denied, 111 S. Ct. 2814 (1991); Thompson v. City of _____ ______ ________ _______ Los Angeles, 885 F.2d 1439, 1443 (9th Cir. 1989) (University of ___________ California) (same); Schuler v. University of Minnesota, 788 F.2d _______ _______________________ 510, 516 (8th Cir. 1986) (same), cert. denied, 479 U.S. 1056 _____ ______ 33 Furthermore, challenges to subject matter jurisdiction typically arise early in the litigation, and even though Eleventh Amendment immunity and diversity jurisdiction may require fact- intensive inquiries, see Kroll, 934 F.2d at 908 n.2, we see no ___ _____ justification for requiring the removing party to resort to formal discovery before the opposing party with readier access ______ to the evidence raises a specific dispute relating to a duly alleged jurisdictional fact. Such a requirement would invite needless waste of judicial resources on a threshold issue which must be resolved as expeditiously as practicable. See Tanzymore ___ _________ v. Bethlehem Steel Corp., 457 F.2d 1320, 1323 (3d Cir. 1972) (no _____________________ need for evidentiary hearing on jurisdictional question if no facts are in genuine dispute). Without statistical evidence, URI's rebuttal was exceedingly thin. Nevertheless, because it is clear that the Board is "dependent" on the State for some unknown portion of its revenues, we will assume, arguendo, that certain provisions of ________ the enabling statute cited by URI did give rise to a genuine dispute over an important jurisdictional fact whether the Board actually enjoys financial autonomy from the State. See, ___ e.g., R.I. Gen. Laws 16-59-5 (Board must hold annual meeting to ____ discuss budget and "invite" members of general assembly); id. ___ 16-59-9(c) (all proposals for tuition increases must be made before State appropriates funds for fiscal year). ______ ____________________ (1987); Goss, 588 F.2d at 98-99 (same). ____ 34 As far as we can discern from the case law, in only three situations has the financial autonomy authorized by an enabling statute been considered illusory. First, "functional integration" may obtain if the State nonetheless bears the ultimate legal responsibility to answer for debts on which the ________ state university defaults. Thus, the very financial independence accorded the Board under the Rhode Island enabling statute ultimately might expose the State treasury to liability for the Board's financial obligations. In Kovats, 822 F.2d at 1309, the ______ Third Circuit flatly rejected such a functional integration claim where the legislature's decision to answer for the university's debts appeared to be purely discretionary and not legally bind- ing. Cf. also Fitchik, 873 F.2d at 661 (the State's disclaimer ___ ____ _______ of any obligation to "cover" is the primary consideration, not the relative size (50-70%) of the state appropriation); but cf. ___ ___ Hall, 742 F.2d at 304-05 (no statute prohibits university from ____ incurring debt in state's name, and fact that state will have to __ _______ ____ "cover" debt by law is indicative of "alter ego" status); Krie- _____ ger, 765 F. Supp at 761 (where District of Columbia expressly ___ committed itself to funding, agency not wholly "self-supporting" is "mere arm"). Even if a state's ultimate legal obligation to "cover" a university's financial obligations were the controlling consi- deration in the diversity context, however, but see Moor, 411 ___ ___ ____ U.S. at 719 (noting that the county, "and from all that appears ____ ___ ____ _______ the county alone, is liable for the judgments against it") 35 (emphasis added), the Rhode Island statutory scheme evinces no conclusive answer as to whether the State is so obligated. We have neither been cited to, cf. supra note 8, nor have we found, ___ _____ statutory language governing whether the State of Rhode Island ultimately is responsible for the Board's corporate financial obligations. Cf. Metcalf & Eddy, ___ F.2d at ___ [No. 91-1602, ___ ______________ 1993 U.S. App. LEXIS 10064, at 13-14 (1st Cir. May 3, 1993)] (statute explicitly divested Puerto Rico Aqueduct and Sewer Authority of power "to pledge the credit or taxing power of the Commonwealth," thereby "erect[ing] a wall between the agency's appetite and the public fisc.").17 Second, the amount of the Board's nonappropriated funding, either in absolute or relative terms, might be consid- ered so insubstantial as to leave the Board financially dependent on the State. But even assuming, arguendo, that an entity ________ receiving any State funding or subsidy is thereby inevitably rendered susceptible to State pressure, two principles remain constant. First, an incorporated entity dependent entirely on ________ State appropriations rarely (if ever) would escape characteriza- tion as the State's "alter ego," since the hand that holds all ___ the purse strings presumably controls the dependent entity. See, ___ ____________________ 17The only provision remotely on point empowers the general assembly to appropriate such funds to the Board as the general assembly "deems necessary," R.I. Gen. Laws 16-59-9 (emphasis _____ _________ added), as distinguished from such amount as "is necessary." Furthermore, as we have noted, the general assembly purposively delineated narrow categories of Board "debts" (e.g., student loan ____ guarantees) which would become "state obligations," a seemingly superfluous undertaking if the State implicitly underwrites all Board financial obligations. See supra note 14. ___ _____ 36 e.g., State Highway Comm'n, 278 U.S. at 199 (finding no diversity ____ ____________________ where Highway Commission, despite its power to sue and be sued, "had no funds or ability to respond in damages"); Neves, 837 F.2d _____ at 534 (where monies "will inure exclusively to the benefit of the public fisc," the diversity inquiry is at an end); Culebras ________ Enters. Corp. v. Rios, 813 F.2d 506, 517 (1st Cir. 1987) (Puerto _____________ ____ Rico conservation authority is "alter ego" notwithstanding its power to sue and be sued, where agency directors attested, and plaintiffs did not dispute, that "the agency would not have the funds to satisfy a judgment and that such would have to be satisfied from the general budget of [Puerto Rico]"); see also ___ ____ Kashani, 813 F.2d at 846 (lack of other funding "ensures ultimate _______ fiscal reliance on state"); Gay Students Servs., 737 F.2d at 1333 ___________________ n.28 (same); Hughes-Bechtol, 737 F.2d at 543 ("board has no funds ______________ or ability to respond in damages"); Ronwin, 657 F.2d at 1073 ______ (given State's comprehensive provisions for risk management, "no evidence that the Board, acting in its corporate capacity, could satisfy a libel judgment in any way other than by turning to the state of Arizona"). URI must concede that the Board does not fall within this bright-line category. On the other hand, mere receipt of state appropriations is not conclusive evidence of the recipient entity's "alter ego" ___ status. Many (if not most) political subdivisions routinely receive significant state appropriations, but are characterized ___________ as autonomous entities for immunity and diversity purposes. See, ___ e.g., Mount Healthy, 429 U.S. at 280-81 (city board of education, ____ _____________ 37 which received "significant amount" of state funding, not enti- tled to immunity where State granted board the power to raise its own revenue); Gary A. v. New Trier High Sch. Dist., 796 F.2d 940, _______ _________________________ 945 (7th Cir. 1986) (noting that the "fact that a local school district receives 'a significant amount of money from the state' ___________ ______ __ _____ does not mean that it is an arm of the state") (emphasis added) (citation omitted). In the Eleventh Amendment immunity context, we recently rejected just such a contention: We think [that the Puerto Rico Aqueduct and Sewer Authority's] situation is not unlike that of a typical political subdivision. Such an entity often receives part of its budget from the state and raises the rest indepen- dently. Despite this dual funding, such enti- ties do not automatically (or even usually) come within the zone of protection demarcated by the Eleventh Amendment . . . despite the "significant amount of money" [they] received from the state. Metcalf & Eddy, ___ F.2d at ___ [No. 91-1602, 1993 U.S. App. _______________ LEXIS 10064, at 15 (1st Cir. May 3, 1993)] (citations omitted). Nevertheless, under Moor, the courts are expected to ____ consider available statistical evidence in arriving at a more _________ precise assessment of the relative "significance" of the appro- priated and nonappropriated funding which goes into the universi- ty budget. See Kovats, 822 F.2d at 1308 (entity is "citizen" ___ ______ even though state appropriation is "large," or approximately 50 to 70% of budget). But see Kashani, 813 F.2d at 845 (33% appro- ___ ___ _______ priation suggests "arm"); Hall, 742 F.2d at 304 (average 64% ____ state appropriation suggests "arm"); Jagnandan, 538 F.2d at 1175 _________ (maximum 72% state appropriation suggests "alter ego"). In the 38 present case, however, neither the amount nor the percentage of the Board's nonappropriated revenues can be ascertained from the record. Thus, argues URI, the district court was compelled to find that Chesterton did not sustain its burden of proof on the Board's financial autonomy. In characterizing such statistical data as indispens- able jurisdictional "facts," however, URI misconstrues our case law,18 as well as Supreme Court precedent. We have never inti- mated that such statistical information is itself a jurisdiction- al fact, the absence of which would invariably defeat diversity jurisdiction. The core jurisdictional fact, after all, is financial autonomy. Under the seminal Supreme Court decisions ____________________ 18On occasion, we have adverted to this kind of statistical evidence in the appellate record, as confirmation that a party __ ___ _________ ______ could not establish diversity. See Perez v. Rodriguez Bou, 575 ___ _____ ______________ F.2d 21, 25 (1st Cir. 1978) (in dicta, noting that the "extent and nature" of the Commonwealth's support for the University of Puerto Rico suggested lack of autonomy, but without describing precise statistics, or stating whether University had other forms of substantial nonappropriated income). On other occasions, we have remanded for further factfinding where it appeared that the autonomy equation was so evenly balanced that the proponent on the jurisdictional issue could not meet its ultimate burden of proof without resort to such statistical information, see, e.g., _______ ______ __ ____ ___________ ___________ ___ ____ Ainsworth, 818 F.2d at 1038-39 (noting various factors supporting _________ and undermining autonomy, and remanding to district court for hearing on whether entity receives "significant funding" from the Commonwealth), and that the parties had not been afforded a full and fair opportunity to present evidence in the trial court. Id. ___ at 1038 n.23 (as an alternative reason for remand, noting fact that proponent had not raised the "alter ego" issue until its appellate reply brief, denying opponent "the opportunity to argue . . . or to rebut" the proponent's contentions). Thus, in our earlier denial of the interlocutory appeal in this case, we acted on the side of caution and judicial economy in recommending that the district court allow the parties an opportunity to present ___________ this kind of evidence, on the chance that it might be needed to tip the "alter ego" balance in the final analysis. 39 dealing with both immunity and diversity, there is a noticeable lack of reliance on such statistical data, a fact which confutes ____ its indispensability. See, e.g., Mount Healthy, 429 U.S. at 280- ___ ____ _____________ 81 (noting only "significant amount of money" received from ___________ State) (emphasis added); Moor, 411 U.S. at 719-20 (discussing ____ county's ability to raise its own funds, not whether county received any funds from State); see also Metcalf & Eddy, ___ F.2d ___ ____ at ___ [No. 91-1602, 1993 U.S. App. LEXIS 10064, at 15 (1st Cir. May 3, 1993)]. Unsurprisingly, as the divergent conclusions reached on essentially similar "statistical" evidence suggest, see supra pp. 37-38, a closely calibrated" statistical" approach ___ _____ in these cases entails its own impediments to reliable decision- making; namely, at what levels should the absolute or relative size of an entity's appropriated funding be considered so sub- stantial, or its nonappropriated funding so insubstantial, that "functional integration" is to be presumed, or a previous judi- cial determination of the entity's citizenship set aside? We believe a wide margin of variance would need to be demonstrated before it could be found to have effected a sea change in the entity's jurisdictional status. After all, while not immutable, the citizenship of a public corporation, like its domicile, should be accorded a reasonable measure of permanence; at the very least, ordinary fluctuations in the university's budget ought not occasion continual judicial reevaluation. Thus, trial court rulings on subject matter jurisdiction normally ought not await budgetary data and oscillations absent an evidentiary 40 proffer of sufficient import to alter a determination based on an analysis of state statutory and decisional law. In our view, this approach best comports with the analysis contemplated in Moor. ____ In considering whether Chesterton carried its burden of persuasion on the issue of financial autonomy, we think it is inescapable that the Board's nonappropriated revenues represent a substantial budget component; tuition, housing, dining and admin- istrative fees, donations, bequests, federal grants, and the proceeds from discretionary sales and leases of URI property are not insubstantial revenue sources. Thus, on its face, the enabling statute demonstrates Board access to, and control over, substantial amounts of nonappropriated revenues. Following a trial on the merits, and absent any indication that URI did not have a fair opportunity to identify and produce statistical evidence which might rebut Chesterton's demonstration that the enabling statute confers the requisite financial autonomy to qualify the Board for citizenship under Moor, we conclude that ____ URI's appellate challenge comes too late. Finally, in a similar vein, URI suggests that it might _____ be that the State routinely attunes its annual appropriation to the Board in response to the total amount of nonappropriated funds available to the Board, including the nonappropriated funds accumulated from prior fiscal years and those anticipated in the current fiscal year. Under this "linkage" theory, the State could compel the Board to expend all accumulated and anticipated ______ 41 nonappropriated funds merely by limiting its annual appropria- tions to the difference between the Board's fiscal year revenue requirements and the total available nonappropriated funds. URI's contention that the State might link its appro- priations to the availability of nonappropriated Board funds is pure conjecture. Arrayed against URI's conjecture are the explicit provisions of the enabling statute, as amended in 1988, which expressly state that all nonappropriated funds, including accumulated nonappropriated funds, are to be deposited in a segregated account under the exclusive control of the Board. See ___ Kovats, 822 F.2d at 1308-09 (mere possibility of offset by state ______ appropriations not especially probative of "alter ego" status). Appropriated funds, on the other hand, are to be set apart in a separate account, and all unexpended balances in the appropriated ____________ funds account are to be redeposited to the general fund. Unex- _______ ____ pended nonappropriated funds, however, are carried over from year _______________ to year in the Board's nonappropriated funds account. This separate treatment of appropriated and nonappropriated funds, deliberately mandated by the general assembly, would have been both superfluous and contraindicated had routine "linkage" been intended. Cf. Allende v. Shultz, 845 F.2d 1111, 1117 (1st Cir. ___ _______ ______ 1988) (in general, courts should avoid interpretations which would render a statutory provision meaningless). In the absence of any countervailing showing, the Board's financial autonomy, as ordained by the general assembly in the enabling statute, was 42 sufficient to sustain Chesterton's burden of proof on the central jurisdictional fact at issue under 28 U.S.C. 1332. Accordingly, having weighed the myriad factors contem- plated by Moor, we conclude that the district court correctly ____ determined that Chesterton met its ultimate burden of estab- lishing that the Board enjoys "a sufficiently independent corpo- rate character to dictate that it be treated as a citizen of [Rhode Island]." Moor, 411 U.S. at 721. ____ B. Evidence of Damages B. Evidence of Damages ___________________ In a ruling that proved fatal to URI's claims for damages for breach of warranties, the district court excluded the testimony of URI's longtime controller, Ronald Osborne, a certi- fied public accountant in charge of all URI financial information and accounting practices. URI called Osborne as an expert witness to establish the amount of money it spent to correct the corrosion problem allegedly left unremedied by Chesterton's 1-2-3 System. URI proffered no other evidence on damages. Osborne testified on direct examination that he previously had performed cost assessments on various URI projects, and that his usual procedure was to consult URI financial records and conduct interviews with URI personnel involved in the particular project. He consulted GSO records to ascertain the overtime hours worked in 1985, and conducted several interviews with URI employees and various "private vendors" to ascertain which overtime hours were attributable to the correction of Endeavor's corrosion problem. To these figures he added the cost of fringe benefits (22%) for 43 overtime employees, and "indirect costs," at an unspecified percentage rate, which included expenses for "accounting, pur- chasing, maintenance, [and] utilities." Before Osborne could state an opinion concerning the total monetary damages sustained by URI, Chesterton objected on the grounds that (1) Osborne was not a qualified expert on damages calculation, (2) the factual bases for his calculation included inadmissible hearsay, and (3) the damages calculation included inappropriate factors, such as "indirect costs." URI relied on Federal Rules of Evidence 703 and 705 as grounds for the admission of Osborne's expert opinion. Rule 703 provides that "[t]he facts or data . . . upon which an expert bases an opinion or inference . . . [,] [i]f of a type reasonably relied upon by experts in the particular field in forming opin- ions or inferences upon the subject, . . . need not be admissible in evidence." Fed. R. Evid. 703. Rule 705 provides that "[t]he expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in ______ ___ _____ ________ _________ any event be required to disclose the underlying facts or data on cross-examination." Fed. R. Evid. 705 (emphasis added). The court sustained Chesterton's objection on the ground that URI had not demonstrated that the facts relied on by Osborne were of a type reasonably relied on by experts in damages assessment.19 ____________________ 19The court also expressed a firm preference for requiring preliminary disclosure of the factual "background" for an ex- pert's opinion on direct examination. The court considered this 44 URI's central arguments on appeal are: (1) Rules 703 and 705 afford the right to present unsubstantiated expert testi- _____ mony on direct examination without first disclosing its factual underpinnings, and (2) the district court abused its discretion by adhering to its self-imposed rule of exclusion, a per se rule ___ __ which, according to URI, runs counter to the "burden shifting" implicit in Rule 705 and disregards the obligation to predicate its exclusionary ruling on the particular circumstances. We have no doubt that Rules 703 and 705 permitted the _________ district court to admit Osborne's opinion testimony, see ___ International Adhesive Coating Co. v. Bolton Emerson Int'l, 851 ___________________________________ _____________________ F.2d 540, 545 (1st Cir. 1988) (business and financial records are "obvious" sources relied on by accountants in ascertaining damages), subject of course to Chesterton's right to probe the premises of the opinion on cross-examination. But that is not the question presented. Rather, the issue on appeal is whether the district court abused its considerable discretion by exclud- ing the evidence. We think not. Rules 703 and 705 normally relieve the proponent of expert testimony from engaging in the awkward art of hypothetical questioning, which involves the somewhat meticulous, and often tedious, process of laying a full factual foundation prior to _____ ____________________ procedure preferable to the alternatives, which were (1) to allow the evidence in on direct, then exclude it later if it were found wholly unreliable, or (2) to permit Chesterton to shoulder the burden of testing the reliability of Osborne's methods on cross- examination, leaving the ultimate weight of the evidence to the jury. 45 asking the expert to state an opinion. In the interests of efficiency, the Federal Rules of Evidence deliberately shift the burden to the cross-examiner to ferret out whatever empirical deficiencies may lurk in the expert opinion. Nevertheless, Rules 703 and 705 do not afford automatic entitlements to proponents of expert testimony. Rule 703 requires the trial court to give "careful consideration" to any inadmissible facts upon which the expert will rely, in order to determine whether reliance is "reasonable." Id. at 545. Similarly, under the broad exception ___ to Rule 705 ("unless the court otherwise requires"), the trial court is given considerable latitude over the order in which evidence will be presented to the jury. See Fed. R. Evid. 705 ___ advisory committee's note ("[S]afeguards [to minimize 'unfair' burden on cross-examiner] are reinforced by the discretionary power of the judge to require preliminary disclosure in any __ ___ event.") (emphasis added). While the trial court's discretion is _____ not unfettered, at a minimum the rules suggest that the proponent must be prepared, if the court so requires, to make a limited offer of proof to aid the court in its assessment. Cf. Ambrosini ___ _________ v. Labarraque, 966 F.2d 1464, 1469 (D.C. Cir. 1992) ("A court __________ must know the basis for an expert's opinion before it can deter- mine that the basis is not of a type reasonably relied on by experts in the field."); Head v. Lithonia Corp., 881 F.2d 941, ____ ______________ 944 (10th Cir. 1989) (despite the liberality of Rule 703, court must not abdicate its responsibility to assure "minimum stan- dards" for admissibility as required by Rule 104(a)). 46 Even though URI's threshold burden was minimal, and may have been readily met, it made no attempt whatever to assuage the district court's legitimate concerns, but chose instead to rely on its perceived "right" to have Osborne's opinion admitted under Rule 703. Apparently, URI came to trial with no supporting documentation whatever to substantiate Osborne's assessment of damages. Based on what can be gleaned from Osborne's preliminary testimony, URI's apparent unpreparedness and recalcitrance may have given the district court real concerns as to Osborne's methodology. Unlike the expert witness in International Adhe- ___________________ sive, Osborne's "damages" assessment was not based solely on the ____ conventional examination and compilation of documents from which an expert objectively might ascertain the overtime labor costs incurred in repairing Endeavor's ballast tanks, as distinguished from various other projects at URI and the GSO. Rather, Osborne relied on "interviews" with undisclosed URI employees and "out- side vendors," conducted either by himself or other URI officials who reported to him. The trial court quite reasonably expected URI to explain, out of the presence of the jury, the basic assumptions undergirding its witness's seemingly unorthodox method of reconstruction. Rather than provide an explanation, however, URI simply accepted a directed verdict on the issue of damages. Moreover, when pressed by the district court, URI indicated no inclination to pursue a claim for nominal damages. Although we are given some pause by the district court's blanket statement that it 47 "always requires" the proponent to disclose on direct examination the factual basis for an expert opinion, cf., e.g., Lis v. Robert ___ ____ ___ ______ Packer Hosp., 579 F.2d 819, 822, 822-23 (3d Cir.) (expressing ____________ disapproval of trial court's statement that it invariably exer- cises its discretion to invoke the Rule 611(b) exception), cert. _____ denied, 439 U.S. 955 (1978), there was no abuse of the court's ______ broad discretion in this case, as a sound basis existed for requiring disclosure. III III CONCLUSION CONCLUSION __________ We need proceed no further with this endeavor.20 ____________________ 20URI raises two other arguments on appeal. First, it contends that the district court abused its discretion by denying its motion to file a second amended complaint in November 1991 eighteen months after the filing of its original complaint, and following jury impanelment since URI asserted valid reasons for its lack of diligence. See Quaker State Oil Refining Corp. ___ ________________________________ v. Garrity Oil Co., 884 F.2d 1510, 1517 (1st Cir. 1989) (due ________________ diligence required for amendments). As far as we can discern, the amendment's only significant factual supplementation to the original complaint would allege that Chesterton's representatives "came aboard the Research vessel Endeavor while the Chesterton 1- 2-3 System was actually being applied and said nothing as to its not being equal to the task of painting the ballast tanks." The amended complaint generally shifted the focus of URI's allega- tions from Chesterton's defective manufacture of a product to Chesterton's negligence in recommending an ill-suited product, or its failure to give adequate or continuing instructions on its use. Chesterton suffered no prejudice, however, as most of these new factual matters were in fact "tried by express or implied __ ____ consent of the parties," Fed. R. Civ. P. 15(b). In any event, as the substance of the proposed amendments was wholly unrelated to the issue of damages, amendment would have been futile. See ___ Arzuaga-Collazo v. Oriental Fed. Sav. Bank, 913 F.2d 5, 7 (1st _______________ ________________________ Cir. 1990) (amendment futile if there is no "meaningful indica- tion" that amendment would make a "dispositive difference") (citing The Dartmouth Review v. Dartmouth College, 889 F.2d 13, ____________________ _________________ 48 Absent competent evidence of damages, the district court properly granted judgment as a matter of law in favor of Chesterton on URI's breach of warranty claims. The judgment of the district court is affirmed. The judgment of the district court is affirmed. ______________________________________________ - Concurring Opinion Follows - ____________________ 22-23 (1st Cir. 1989)). Similarly, URI contends that the district court improperly directed a verdict for Chesterton on Count III of the complaint, which alleged Chesterton's breach of a warranty of fitness for a particular purpose. URI merely argues that it presented suffi- cient evidence to establish that Chesterton had reason to know that URI intended to use the product on salt water ballast tanks, and that URI specifically relied on Chesterton's assurances of suitability. Once again, however, absent proof of damages, URI's argument is to no avail. 49 HORNBY, District Judge, concurring. It takes the court HORNBY, District Judge, concurring. __________________________ 38 typed pages (8-1/2 x 11") of closely reasoned text to decide whether the University of Rhode Island is a citizen -- a determi- nation that has nothing to do with the substance of the real world dispute between these parties, but simply resolves where to try their lawsuit. Is this approach really essential for deter- mining whether a federal court has jurisdiction? Granted that our system limits the jurisdiction of federal courts, a rational observer might nevertheless expect simple gatekeeping rules for what gets in and what is kept out. A litigant should be able to ascertain, with relatively modest effort and legal fees, where to bring its lawsuit. But if the court's analysis of a "myriad factors" -- which are "by no means exhaustive" -- is to be the governing standard, future litigants in cases involving similar state agencies had better be prepared to pay a lot of legal fees for their lawyers to (1) read and digest the prose; (2) gather the relevant information and apply the legal analysis to their client or opponent; (3) litigate the issues at pretrial, trial and on appeal. Those litigants had also better be prepared for delays in decisionmaking as lawyers and judges ponder the issue: the "myriad factors" will seldom yield a certain outcome until a court actually decides the issue. To be sure, this court is not alone in adopting this approach. Other courts have also applied a multitude of factors (with no particular weight assigned), in determining the status 50 of a particular state agency. See, e.g., Hughes-Bechtol, Inc. v. ___ ____ _______________________ West Virginia Bd. of Regents, 737 F.2d 540, 543-44 (6th Cir.), _____________________________ cert. denied, 469 U.S. 1018 (1984) (looking at several factors); _____________ Krieger v. Trane Co., 765 F. Supp. 756, 758 (D.D.C. 1991) (exam- _____________________ ining seven factors); University Sys. of New Hampshire v. United ___________________________________________ States Gypsum Co., 756 F. Supp. 640, 645 (D.N.H. 1991) (citing __________________ eight factors); University of Tennessee v. United States Fidelity _________________________________________________ & Guar. Co., 670 F. Supp. 1379, 1386-87 (E.D. Tenn. 1987) (con- ___________ sidering, arguendo, a nine-factor approach). The result is great ________ unpredictability. As the commentaries recognize, "[t]here is no unanimity among the decisions as to whether state agencies or departments are citizens within the meaning of 28 U.S.C.S. 1332, with some decisions holding that they are while others hold that they are not." 1 Federal Proc. L. Ed. 1:200. The ensuing extensive litigation over jurisdiction has undoubtedly caused substantial delay and consumed thousands of dollars in attorney fees where the real goal should have been speedy and inexpensive resolution of the merits of the underlying dispute. The question is whether United States Supreme Court precedents really require such a complex analysis. I think not. I will concede that this court's approach is one plausible reading of the precedents, but there is another plausible reading that keeps the subject matter jurisdiction issue in proper perspective as only a preliminary issue in the underlying econom- ic dispute between the parties. 51 As the court recognizes, a couple of propositions are beyond debate, given United States Supreme Court decisions. First, a State cannot be a citizen of itself: "There is no question that a State is not a `citizen' for purposes of the diversity jurisdiction." Moor v. County of Alameda, 411 U.S. ___________________________ 693, 717 (1973). Second, incorporated branches of state govern- ment (for example, cities and counties) are citizens of the state ___ of their incorporation. See Cowles v. Mercer County, 74 U.S. (7 ___ ________________________ Wall.) 118, 122 (1869). This resulting principle of independent citizenship for a public corporation had become so "well settled" by 1972 that the Supreme Court no longer stopped to question it. See Moor, 411 U.S. at 718, quoting Illinois v. City of Milwaukee, ___ ____ _______ _____________________________ 406 U.S. 91, 97 (1972). Here, the Rhode Island Board of Higher Education1 is separately incorporated with the power to sue and be sued. The diversity statute provides: "[A] corporation shall be deemed a citizen of any state by which it has been incorporated . . . ." 28 U.S.C. 1332(c). What more need be said to conclude that the Rhode Island Board is a citizen for diversity purposes? The court apparently believes that its lengthy and complex analysis is required by Moor. But in Moor the Supreme Court spent only ____ ____ one paragraph summarizing California statutes to conclude that the county was a corporation with important powers independent of the state and a second paragraph summarizing a California Supreme ____________________ 1I agree with the court that there is no legal entity under Rhode Island law known as the University of Rhode Island. 52 Court decision finding California counties to be corporations. Based on those two summary paragraphs, the Supreme Court conclud- ed that "the county has a sufficiently independent corporate character to dictate that it be treated as a citizen of Califor- nia under our decision in Cowles v. Mercer County, supra." 411 _______________________ _____ U.S. at 721. A parallel short treatment of Rhode Island law can dispose of the jurisdictional issue in this case. The Board that governs the University of Rhode Island is a "public corporation, empow- ered to sue and be sued in its own name, to have a corporate seal, and to exercise all the powers, in addition to those hereinafter specifically enumerated, usually appertaining to public corporations entrusted with control of post-secondary educational institutions and functions." R.I. General Laws 16- _________________ 59-1-(a) (1992). Under Rhode Island law, a "public corporation" is "a corporate entity which is considered a governmental agency but which has a distinct legal existence from the state or any municipality, [and] does not constitute a department of state or municipal government . . . ." Id. 22-10-2(f). The Board has the __ corporate power to acquire, hold, and dispose of real and person- al property (albeit in trust for the state). Id. 16-59-1(b). __ The Board is entitled to levy tuition and other fees in order to obtain funds to carry out its activities. Id. 16-59-9. Its __ receipts from sources other than state appropriations do not go into the state's general fund and are subject to use at the Board's order. Id. 16-59-18. It appoints the presidents of __ 53 postsecondary institutions and has a great deal of authority in determining what postsecondary education will be available to Rhode Island citizens. Id. 16-59-4, 8. This summary paints a __ picture of a "sufficiently independent corporate character" to match that of the California county at issue in Moor. No more ____ should be necessary.2 I therefore concur in the court's evalua- tion that jurisdiction exists, but not in the prolonged reasoning by which it reaches that conclusion. I add one postscript: The careful reader will observe that neither I nor the court have articulated any jurisdictional policy arguments in determining the citizenship of the Board. The policy interests behind the court's myriad factor approach are borrowed -- I believe ill-advisedly -- from Eleventh Amend- ment cases where the primary goal is to protect the state trea- sury. Perhaps the court's complex analysis and case-by-case approach are justified there. The policy goals in diversity jurisdiction analysis are somewhat different, involving avail- ability of an unbiased forum. The Supreme Court has not ad- ____________________ 2Since the Board is a public corporation, it seems unneces- sary to pursue the "arm or alter ego" alternative set forth in _____ ___ State Highway Comm'n of Wyoming v. Utah Constr. Co., 278 U.S. ______________________________________________________ 194, 199 (1929). There, a lawsuit was brought against the Wyoming State Highway Commission (an unincorporated state agency) and its individual members, premised on diversity of citizenship. The Supreme Court found no diversity jurisdiction. Primarily, the Court determined that the suit was not really against the Highway Commission but against the State of Wyoming itself, because it was the State that was actually a party to the con- tract in dispute and neither the Commission nor any of its members had assumed any responsibility. The sentence most often quoted (and referred to in Moor) states: "The Commission was but ____ the arm or alter ego of the State with no funds or ability to _____ ___ respond in damages." 278 U.S. at 199. 54 dressed them in its analysis of what is a citizen and neither do I. In any event, such interests can best be served by clear rules for the generality of cases; every single piece of litiga- tion need not require a return to first principles. Probably, the major policy interest at stake lies in how the conclusion is ___ reached. Simplicity from the courts of appeals (and the Supreme Court) on these gatekeeping and procedural issues will permit lawyers and judges -- and most importantly, the parties -- to deal with the merits of disputes in a simple and less costly manner. Needlessly complex jurisdictional rules like those the court advances here can only perplex the litigants as they pay mounting attorney fees and suffer through procedural delays. Congress has ordered district courts to pay heed to such concerns in the Civil Justice Reform Act of 1990, 28 U.S.C. 471-482. Appellate courts can make that task easier by resisting unneces- sary subtleties and focusing instead on rules that ensure pre- dictability and certainty, as well as fairness. In all other respects, I join the court's opinion. 55